Filed 3/12/21  P. v. Alvarez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073501 |
| v. | (Super.Ct.No. RIF1600672) |
| JOSEPH ALVAREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Affirmed as modified.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Melissa

Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

1

In February 2016, three California Baptist University (CBU) students went to a well-known student hangout in the orange groves near campus in Riverside to eat hamburgers and hang out without being subject to the strict on-campus curfew rules. Defendant, a Hillside Riva gang member; his 16-year-old son (Son); and a fellow gang member, Jimmy Zamorano, drove up and confronted the three students. Defendant stood by the vehicle while Son and Zamorano hit one of the students, who immediately ran. Son and Zamorano then beat up the two remaining students and took a cellular telephone. Defendant directed Son and Zamorano that it was time to leave. Defendant, Son and Zamorano were tracked to defendant's nearby home. Defendant was involved in a stand-off with police during which he wrestled with a police dog. Defendant was convicted of one count of robbery, two counts of attempted robbery, making criminal threats, harming a police dog, and several gang enhancements.

Defendant claims in his opening brief on appeal that (1) the admission of extensive, cumulative and prejudicial gang evidence was an abuse of discretion and a violation of his federal Constitutional due process rights; (2) the trial court erred and violated his federal due process rights by admitting evidence that Zamorano had pleaded guilty to the same charges prior to trial; and (3) his sentence for making criminal threats should be stayed pursuant to Penal Code section 654.[1]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Defendant was charged by the Riverside County District Attorney's Office with robbery (§ 211; count 1); two counts of attempted robbery (§§ 664, 211; counts 2 & 3); making criminal threats (§ 422; count 4); and interference with a police dog (§ 600, subd. (a); count 5). In addition, he was charged with the special allegation that the violent crime in count 1 was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). It was further alleged that the crimes in counts 2, 3, and 4 were committed on behalf of a criminal street gang (§ 186.22, subd. (b)(1)(B)). Finally, he was charged with having suffered one serious and violent prior conviction (§§ 667, subd. (a), (c)-(e)(1), 1170.12, subd. (c)(1)). The trial court reduced count 5 to a misdemeanor prior to the case being sent to the jury.

Defendant was found guilty of the charged crimes and gang allegations. Defendant waived his right to a jury trial on the prior conviction and admitted he had suffered the prior serious and violent felony conviction. Defendant was sentenced to 23 years 8 months to be served in state prison.[2]

---

[2] The trial court chose not to strike the section 667, subdivision (a), prior despite having the discretion to do so. In addition, the trial court determined that defendant had the ability to pay the fines and fees it imposed.

3

B.     FACTUAL HISTORY

1.     *ROBBERY OF THE CBU STUDENTS*

On February 9, 2016, Bryan V.[3] was a student at CBU in Riverside. On that night he was with his friend, Alex T., and his roommate A.L. Since CBU had a strict curfew on campus, they decided to leave campus and get hamburgers. They took the food to an area near some orange groves where CBU students oftentimes gathered. Bryan had been to the location on at least 10 prior occasions and encountered no problems. A.L. and Alex had been to the orange groves on several prior occasions. The area was down a dirt road and there were not many houses in the area. There was only one way in and out.

They arrived at the location around 9:30 p.m. They were in a car that belonged to A.L.'s girlfriend. They stood outside the car eating and talking for about 20 minutes. While they were talking, a red car drove up and the occupants waved at them. Bryan thought they may be other CBU students and waved back. A.L. thought they may be friends until they got closer. Two men approached while one man waited by the car. Bryan and A.L. realized they did not know the men. One of the men was older than Bryan and had "burning eyes," and the other was a young, skinny "kid."[4] One of the men

---

[3] We refer to the victims in this case by their first names to provide them with some measure of anonymity. (Cal. Rules of Court, rule 8.90(b)(4).) No disrespect is intended.

[4] At trial Alex recalled that three men exited the vehicle and surrounded them. He also recalled that defendant exited the driver's seat and asked the other two if they knew these guys.

asked, "You know where you're at?"  One of the men punched Alex hard in the jaw and he fell to the ground.  Alex got up and ran away.

Bryan said "What the hell," and told the men they had not done anything.  Both men started beating up Bryan.  Bryan had his cellular telephone in his hand, which flew out of his hand when they started beating him up.  One of the men took his phone.  They told Bryan "Get on the ground or we're gonna kill you."  Bryan was able to break free and started running.  The third man by the car, identified as defendant, said to Bryan, while laughing, "Don't run, or it's gonna be worse."  Bryan was afraid for his life.  Bryan was a cross-country athlete so he knew he could outrun them.  He ran into the orange groves.

As Bryan was running, he heard someone yelling to him, "I told you not to run.  We told you not to run.  We're gonna kill you."  Bryan ran deeper into the orange groves then laid down flat on the ground hoping they would not find him.  He heard them getting closer so he got up and ran again.

A.L., who was still by his girlfriend's car, heard one of the men tell him it was "Hillside" territory.  A.L. tried to run away but defendant, who was still at his car, stepped in front of him.  Defendant asked him "Where are you trying to run, boy?" or "Where you going?  Get back here."  Defendant started walking toward A.L.  A.L. turned around and went back to his car because he was scared of defendant.  The two other men threw him to the ground and kicked him several times in the face.  They reached into his pockets and tried to grab items.  All three of the men asked him for money.  A.L. told

5

them he did not have any money. They told him to get in his car and drive away. Defendant and the two other men got in their car and drove away.

Bryan was able to get to the street, flag down a car, and asked the occupants to call the police. Around 10:00 p.m. on February 9, 2016, City of Riverside Police Officer Eric Hibbard[5] was working patrol with his police dog. Officer Nicholas Vazquez was also working patrol. They both received a call regarding a robbery in the area of Madison and Lenox Avenue in Riverside. Officer Hibbard arrived at approximately 10:15 p.m. Officer Vazquez also responded and spoke with Bryan, who gave a description of the suspects and their vehicle.

Officer Hibbard drove in the direction where the suspects had gone. As he was driving, he saw a vehicle matching the suspects' vehicle parked in the driveway of a house located on Lenox Street. Officer Hibbard stopped his vehicle and walked up the driveway. The garage door was open and defendant was sitting in the garage listening to music. Defendant jumped up and walked to the garage door. Officer Hibbard asked defendant to come out of the garage to talk to him. Defendant yelled, "The cops are here," and shut the garage door. Officer Hibbard called for more officers. Officer Hibbard felt the hood of the suspects' vehicle and it was still warm.

Officer Hibbard went back up the driveway to his car. Officer Vazquez and other officers arrived to assist Officer Hibbard. Defendant came in and out of the house. He yelled and cursed at them. He yelled "Fuck you" and "Get off my property." The

---

[5] Officer Hibbard retired in March 2017.

6

officers yelled to him that they needed to talk to him. Defendant went in and out of the house at least six times. Defendant flashed what appeared to be gang signs at them. Son was found hiding in the bushes in the neighbor's front yard. He matched the description given by one of the victims and was detained.

After approximately one hour, Officer Hibbard and the other officers decided that the next time defendant emerged from the house they would detain him. When defendant came out the front door, Officer Hibbard approached him with his police dog. Another officer was with him with his rifle. They yelled for defendant to get down on the ground. Defendant did not comply and, after giving a final warning that he was going to do so, Officer Hibbard released his dog.

The police dog tried to grab defendant's leg, but defendant was able to grab the dog by its collar. Defendant picked the dog up by its collar and held him hanging up by the collar. The police dog was flailing around and trying to bite defendant. Officer Hibbard was concerned that defendant was going to hurt the dog so he ran to help it. Officer Hibbard punched defendant in the face in order to get him to let go of the dog. Defendant fell to the ground but did not surrender. Defendant kept his hands underneath him to keep from being handcuffed. The police dog latched on to defendant's right arm and Officer Vazquez used his Taser on defendant but defendant still resisted. Defendant was finally subdued and handcuffed. Defendant spit at the medical personnel who tried to help him.

Six or seven other individuals were found in the house including Zamorano. Bryan's phone case was found hidden under a mattress in one of the bedrooms. The

7

phone was not in the case, which also contained Bryan's credit card, social security card, and driver's license; those items were never found. Shorts and pants, which matched what defendant and Zamorano had been wearing at the time of the incident, were found in the house. A grey hat with a "D" on it was found in one of the bedrooms. Graffiti and photographs were found on the walls of the garage. There was a "Hillside" sign hanging in the garage. Another item had "VHS Riva" on it.

Bryan identified Zamorano and Son at an in-field lineup as the persons who beat him up. Bryan also identified their vehicle. A.L. was able to identify defendant as the driver of the car, and the two other suspects that night; he also identified their car. Alex identified Zamorano but he could not identify defendant.

Alex's jaw was dislocated as a result of being hit. Bryan struggled after the incident. He began drinking heavily and it took him an additional year to graduate. A.L. testified that defendant appeared to be leading the two men by telling them when to stop beating him up and when it was time to get back in the car. A.L. suffered a black eye and several bruises to his torso area. He did not need medical attention.

2. *GANG EVIDENCE*

Four Riverside County police officers testified regarding prior encounters with defendant. On July 9, 1998, defendant was contacted in a park and admitted membership in the Hillside Riva gang. On October 12, 2007, defendant was at Nichols Park in Riverside at 2:00 a.m. when he was contacted by an officer. Defendant admitted to being affiliated with the Dukes gang, which was part of Hillside Riva. On November 15, 2007, defendant was involved in a traffic stop. Defendant admitted gang membership in

8

Hillside Riva, Dukes subset. On December 30, 2015, defendant had contact with officers at a house, where he admitted to being a member of the Hillside Riva gang.

On December 28, 2004, Riverside County Police Sergeant Matthew Koser was at his home in Riverside. Around 11:00 p.m., he heard 10 gunshots behind his house. He called 911 and went out to the area behind his house. He observed a white vehicle coming down the street. The driver had his left arm out the window and was firing a gun into the air. The vehicle was stopped by other officers a short distance from Sergeant Koser's house. Defendant got out of the passenger's seat of the car and went with the driver into the house where they had been apprehended instead of complying with the police demands to get down on the ground. Defendant and the others in the house eventually came out. The driver was identified as Andrew Molina. Nine-millimeter expended shell casings were found on the floor of both sides of the vehicle. A nine-millimeter handgun and two empty magazines were found in a backpack in a bedroom that had been occupied by defendant that night.

On May 13, 2005, defendant was convicted of a violation of section 246.3, willfully discharging a firearm in a grossly negligent manner that could result in injury or death, for the incident described *ante*. Defendant admitted that at the time he committed the crime, he was an active participant in a criminal street gang and willfully promoted, assisted and furthered criminal conduct of gang member Molina within the meaning of section 186.22, subdivision (a). Molina entered a guilty plea to the same charges.

City of Riverside Police Sergeant Adam Levesque was assigned to the gang intelligence unit. In January 2014 he was involved in a search at David Zamorano's

9

house and seized David's cellular telephone. David was a documented Hillside Riva gang member. Defendant's phone number was in his contacts under defendant's gang moniker "Smurf." Photographs of defendant throwing gang signs were on David's phone; he was with Daniel Zamorano and David Zamorano in the photographs.

On January 30, 2014, Sergeant Levesque was involved in a search of defendant's residence. Defendant was present and had a Hillside tattoo on his back. He insisted he was no longer an active member of the gang. Gang graffiti was found in his house and garage.

Sergeant Levesque explained that the Dukes of the Hillside Riva gang were the top level of the gang. Jimmy, Daniel, David and Joseph Zamorano were all brothers. Sergeant Levesque was involved in an investigation of the brothers on August 8, 2013. When they were contacted, Jimmy was wearing a Duke Blue Devils hat, which was commonly worn by Hillside Riva gang members who were part of the Dukes subset. Joseph had an "H" tattooed on his head. Nearby where they were detained a duffel bag filled with guns was found. In his pocket, Daniel had a part of one of the guns found in the duffel bag. Jimmy had 19 rounds of .22-caliber ammunition in his backpack. Defendant was not involved in this incident. On July 3, 2015, Jimmy Zamorano and his brother Eric Zamorano were arrested in a stolen vehicle.

Defendant was a passenger in a stolen vehicle on July 4, 2013. He was with another fellow gang member. Defendant was convicted of trying to help the fellow gang member escape arrest for possessing the stolen vehicle.

10

The jury was advised that Zamorano had pleaded guilty prior to trial to the instant crimes and the gang allegation.

In February 2016, City of Riverside Police Detective David Johansen was assigned to the gang unit. He had previously testified as a Hillside Riva gang expert. Detective Johansen indicated that gangs existed for the purposes of criminal activity. The gang's culture relied on fear and intimidation. A gang member earned respect by committing violent crimes. Violent crimes also helped elevate the status of the gang. Older members who had already put in the work for the gang no longer had to commit crimes and became "shot callers." The gang made money by selling drugs, stealing cars and committing robberies.

A younger gang member was expected to follow what a older, shot caller gang member told him to do. Associates and hangouts were younger men who wanted to become gang members. They were expected to commit violent crimes to gain entry into the gang. A new member could commit a crime for the gang to gain entry or be "jumped" in by getting beat up by other members. Many new members were brought in by family members.

A Hillside Riva gang member would have to earn getting the gang's tattoo. Gang graffiti was important to show the gang's territory and to intimidate. While committing crimes, gang members would say the name of the gang to get credit for the gang for the crime. Hillside Riva was not a large gang, but it was known for committing violent crimes and intimidating people. In Detective Johansen's experience, it was very rare for a gang member to leave the gang.

11

Detective Johansen had numerous interactions with Hillside Riva gang members during his years with the Riverside Police Department. Hillside Riva members oftentimes hung out in Nichols Park and claimed it as their territory. The Hillside Dukes were part of the gang. Some of their gang clothing included hats with just an H on them or D for Dukes. A common gang sign was an "H" made with the hands. The primary activities of Hillside Riva were shootings, robbery, and witness intimidation. The Dukes made decisions for the gang and called the shots. There were only six or seven Dukes in the Hillside Riva gang. The Dukes in the Hillside Riva gang were the highest and most respected members.

Detective Johansen was aware that Zamorano had been convicted for the crimes charged against defendant. In his opinion, Zamorano was an active member of the Hillside Riva gang on February 9, 2016. Stephen Archuleta had a conviction for felony evading the police on March 22, 2016. He was a known Hillside Riva gang member. Henry Vasquez, a Hillside Riva gang member was convicted of felony assault with force likely to cause great bodily injury in September 2015 for crimes he committed in 2013. He was also convicted of the allegation that he committed the crime for the benefit of and at the direction of the gang. Jose Flores, a Hillside Riva gang member, was convicted in November 2010 of attempted murder and discharge of a firearm causing great bodily injury. The allegation that he was an active participant in a criminal street gang was found true. These crimes showed a pattern of criminal gang activity by Hillside Riva.

In Detective Johansen's opinion, Hillside Riva was a criminal street gang. Detective Johansen knew defendant as Smurf.

12

Detective Johansen went to defendant's house on February 16, 2016. He met with defendant's wife, Melissa, and she told him, "I can't believe he brought our son into that shit." He observed the Hillside Riva graffiti and photographs in defendant's garage. Detective Johansen was unaware that Son was a member of the Hillside Riva gang. He was likely an associate. All five of the Zamorano brothers were documented Hillside Riva gang members. Joseph, David and Eric were Dukes.

It was Detective Johansen's opinion that on February 9, 2016, defendant was an active member of the Hillside Riva gang. He was also a Duke. This was based on the graffiti in his home, his associations and tattoos. His getting more tattoos between 2004 and 2016 showed he continued to be part of the gang. Further, he admitted being a member two months prior to the instant crimes. In Detective Johansen's opinion, defendant was considered one of the more senior and respected members of the Hillside Riva gang.

Detective Johansen believed, based on a hypothetical with the same facts of the instant case, that such a crime was committed on behalf of and in furtherance of the gang. The crimes furthered the reputation and status of the Hillside Riva gang. In his opinion, defendant being present with his son and a fellow gang member was a way to bring his son into the gang. His opinion that this was a gang crime was also based on the fact Zamorano admitted in court that the crimes were done to benefit the gang.

3.    *DEFENSE*

Defendant recalled Officer Vazquez. Bryan told Officer Vazquez that two persons exited the rear of the car when the suspects arrived at the orange groves but that no one

13

exited the driver's seat. Bryan never told him that he had any interaction with defendant at the orange groves.

Bryan and Alex were at the hospital when they were asked to identify defendant. They did not identify him.

Melissa Alvarez had been married to defendant for 24 years. They had lived together at the home on Lenox Street, which belonged to defendant's father. She and defendant had been separated off and on since 2000; they were separated in 2016. Son was 20 years old at the time of trial. The orange groves were not far from their home. Son spent time at the orange groves with his friends.

In February 2016, Son was having trouble in school and was getting into trouble. He had been kicked out of high school for smoking marijuana. He was drinking and ditching his continuation school. Defendant and Son had a good relationship. Son was headed toward a gang lifestyle and defendant tried to steer him away. Melissa and defendant wanted to send him away to a program in San Diego to help him finish school and get a vocation.

On January 27, 2016, Melissa, Son and defendant went to San Diego to try to enroll in the program. Son was interested. In February 2016, Melissa claimed that defendant was not going out as much and was trying to get her back. Melissa spoke with a police officer after the incident and said, "Senior brought our son into that shit." Melissa said it out of anger.

DISCUSSION

A.        <u>ADMISSION OF GANG EVIDENCE</u>

Defendant insists the trial court erred and violated his federal Constitutional due process rights by admitting extensive and irrelevant gang evidence. Defendant does not object to any particular gang evidence that was admitted but rather claims the volume of gang evidence was prejudicial.[6]

1.       *ADDITIONAL FACTUAL HISTORY*

Prior to trial, the People filed points and authorities in support of the introduction of gang evidence. They argued such evidence was admissible to prove the elements of the special allegations pursuant to Penal Code section 186.22, subdivision (b)(1). The People had to prove that Hillside Riva was a criminal street gang and in order to show a pattern of criminal street gang activity, prior crimes must be admitted. The People sought to introduce expert testimony and certified copies of prior convictions. The People sought to admit a total of five prior convictions. They also wanted to admit defendant's prior conviction of violating Penal Code section 186.22, subdivision (a), as direct evidence that defendant actively participated in the Hillside Riva gang and that he was aware the gang engaged in a pattern of criminal gang activity. The probative value of this prior conviction outweighed any prejudice within the meaning of Evidence Code

---

[6] For the first time in the reply brief, defendant refers to specific gang evidence that should have been excluded. We will not consider such argument raised for the first time in the reply brief. (*People v. Senior* (1995) 33 Cal.App.4th 531, 537.)

15

section 352. The People also sought to admit evidence of defendant's prior law enforcement contacts wherein he admitted gang membership.

Defendant's counsel filed opposition to the admission of the gang evidence. Defendant's counsel provided a list of the evidence that should be excluded. This included admission of gang membership by defendant in 1998, 1999, 2001, and 2007 because they were too remote. Further, defendant's prior conviction should be excluded because it had been suffered 15 years prior to the trial and was prejudicial. Further, photographs and drawings that were gang related, including one with an unknown male holding a shotgun, which were found during a probation search of defendant's home, should be excluded as prejudicial. An incident from 2015 in which defendant admitted gang membership should be excluded as not relevant and prejudicial. Further, prior crimes committed by Zamorano should be excluded as prejudicial.

The matter was heard prior to trial. The People argued they must submit numerous instances during which defendant admitted gang membership throughout the years to show he was an "OG Hillside Riva," and was a shot caller in the gang. Further, the People expected defendant was going to claim he was no longer a member of the gang. It was important to prove that he had been a long-time member and had strong ties to the Hillside Riva gang. The trial court noted that it could see the relevance of the continuous gang involvement but at some point the amount of evidence would become cumulative.

The trial court agreed to exclude the photograph of an unknown male holding a shotgun, which was found during a search of defendant's house. The court also limited a

16

December 30, 2015, incident by only allowing the People to admit evidence that defendant admitted his gang membership.

Defense counsel objected to the prior gang incidents and involvement of Zamorano and his brothers. Defendant's counsel argued that they had been involved in numerous crimes and that information about their criminal history was inflammatory. The trial court found that since defendant was with Zamorano at the time of the current crime, that such evidence was relevant, especially because of Zamorano's numerous gang contacts.

## 2. *THE ADMITTED GANG EVIDENCE WAS RELEVANT*

"The trial court has broad discretion in determining the relevance of evidence." (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.) "Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)

" 'Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 581.) "Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements. [Citation.] Thus, a properly qualified gang expert may testify about a wide range of issues, including a gang's

17

territory, retaliation, graffiti, hand signals, tattoos, and clothing. [Citation.] [¶] Expert testimony is also relevant and admissible to . . . prove the gang's primary activities." (*People v. Williams* (2009) 170 Cal.App.4th 587, 609.) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citations.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.)

After *People v. Sanchez* (2016) 63 Cal.4th 665, an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) As such, the prosecution must call witnesses to testify regarding case-specific facts such as admissions of gang membership. (See *People v. Ochoa*, *supra*, 7 Cal.App.5th at pp. 588-589.)

"The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)

The admission of gang evidence here was relevant to prove the gang enhancement, to show defendant was aiding and abetting the offenses, and to show motive. The People had to prove for the gang allegation that defendant committed the crime for the benefit of or at the direction of the gang. The jury had to conclude that Hillside Riva was a gang, which was defined as any organization with a group of three or more persons; they had

18

common signs or symbols; one or more of its primary activities was the commission of robberies or attempted robberies; and whose members engaged in a pattern or criminal gang activity. The evidence presented as to defendant's admission of gang membership was necessary to show that he would not have just quit Hillside Riva before the crimes, and that he was still an active member. Further, the offenses committed by Hillside Riva gang members were relevant to show that there was a pattern of gang activity. There is nothing that supports the People are limited to just two predicate offenses. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1138-1140 [admission of eight predicate offenses is not excessively cumulative].) Moreover, the photographs of gang graffiti in defendant's garage and in photographs was proper to show both the signs and symbols of the gang, but also to show defendant continued to be a member. Defendant's prior crimes committed with gang members were relevant to show his status in the gang and his ongoing participation.

Defendant complains that dozens of gang-related photographs were admitted and 13 different law enforcement officers testified regarding the Hillside gang and defendant's involvement. However, as noted, after *Sanchez* any out-of-court statements that are hearsay cannot be testified to by a gang expert. The People chose to proceed on the theory that defendant was the shot caller and that he aided and abetted the crimes by directing Son and Zamorano. The People were entitled to introduce relevant evidence to support this theory. Further, the People were required to present the testimony of numerous officers to testify about admissions of gang membership made to them by defendant pursuant to *Sanchez*. The testimony of each officer was brief, the nature of the

19

gang contacts was less inflammatory than the charged crimes and "certainly not so cumulative as to lack probative value." (See *People v. Tran* (2011) 51 Cal.4th 1040, 1050.)

Further, the trial court did not err by admitting evidence of predicate crimes committed by Zamorano and his brothers. The evidence was relevant to show the pattern of gang activity and also to show that defendant was with a well established Hillside Riva gang member when he committed the instant offenses. Here, defendant denied that he was an active member of Hillside Riva and denied that he was seeking to indoctrinate Son into the gang. The People were properly allowed to admit numerous predicate offenses, including the prior offenses committed by defendant, to show both a pattern of gang activity and defendant's gang involvement. The admission of gang evidence was probative, and the amount of evidence was not overly prejudicial.

### 3. *HARMLESS ERROR*

Defendant contends the admission of the evidence violated his federal Constitutional right to due process and was prejudicial requiring reversal of his convictions. "We review evidentiary errors for prejudice by determining whether it was reasonably probable that a jury would have returned a more favorable verdict for defendant had the court not admitted the evidence." (*People v. Felix* (2019) 41 Cal.App.5th 177, 187, citing to *People v. Watson* (1956) 46 Cal.2d 818, 836.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Absent fundamental unfairness, state law error in admitting evidence

20

is subject to the traditional *Watson* test." (*Ibid*.) Here, defendant's trial was not fundamentally unfair, and it is not reasonably probable the verdict would have been more favorable to defendant if the gang evidence had been excluded.

The jury was advised it could only consider the gang evidence for the limited purpose of deciding if he "acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged," to show motive, and judge witness credibility. The jury was specifically instructed "You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jurors followed the instructions and did not find defendant guilty based solely on the gang evidence presented. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions, and there is nothing in this record to rebut that presumption"].)

Finally, the evidence of defendant's guilt was overwhelming. Defendant was present while Son and Zamorano approached Alex, and one of the two hit Alex hard in the jaw. Defendant then observed Zamorano and Son beat up Bryan and A.L. They took Bryan's phone, which held his credit card, social security card, and license. Defendant laughed at A.L. and Bryan, telling them not to run. Defendant told Son and Zamorano to stop and they all left together. Defendant did not comply with officers who located him, Zamorano, and Son together at defendant's house, which was near where the incident occurred. Defendant refused to surrender to police and attacked a police dog. He continued to resist even after being handcuffed. Bryan's phone case was found in

21

defendant's house. The evidence overwhelmingly supported that defendant was present and aided and abetted Son and Zamorano.

B.     ADMISSION OF ZAMORANO'S PLEA

Defendant further contends the trial court erred and violated his federal Constitutional due process rights by admitting evidence that Zamorano had pleaded guilty prior to trial to the same charges. He insists the jury relied on Zamorano's plea to find defendant guilty in this case.

1.     *ADDITIONAL FACTUAL HISTORY*

Prior to trial, the People sought a ruling on the admission of gang evidence. As one of the predicate offenses, the People sought the admission of Zamorano's guilty plea to the charges in this case. The People argued, "In the current case, co-defendant Jimmy Zamorano, pled guilty to the court, admitting all counts and allegations, including the 186.22 (b) allegations attached to each count. It is well established that the current crime can serve as a predicate. (See *People v. Loeun* (1997) 17 Cal.4th 1.)" The People argued that in addition to being relevant as a predicate offense, Zamorano's prior offense was relevant to prove the section 186.22, subdivision (b), allegation against defendant. The People had to prove that Zamorano was also a member of the Hillside Riva gang. This evidence was extremely relevant to establish that defendant was acting in concert with another gang member at the time he committed the crimes in this case. Further, the evidence was more probative than prejudicial.

At the hearing on the matter, the trial court ruled that the admission to the section 186.22 allegation by Zamorano would be admitted. Defendant's counsel objected to the

22

admission as a predicate because there were other crimes that could be admitted. The trial court requested case law supporting that the People were not allowed to use a crime as a predicate that arose from the same case. Defendant's counsel was unaware of any case law but argued it should be excluded pursuant to Evidence Code section 352.

The trial court ruled, "The Court makes the finding that it is not unduly prejudicial in light of the fact of all the other evidence that is coming in as to defendant's gang ties that stretch all the way back to the late '90s and it's highly probative in light of the fact that the People have to prove current membership. The trial court read to the jury that Zamorano was convicted of robbery, two counts of robbery, and making criminal threats. In addition, he admitted to assisting or aiding a criminal street gang, and that the crimes were committed on behalf of the gang.

### 2.    *ANALYSIS*

We need not consider if the trial court improperly admitted Zamorano's plea, as any conceivable error was harmless. "[W]e determine from the whole record whether it is reasonably probable that without the error a result more favorable to the defendants would have occurred." (*People v. Haynes* (1984) 160 Cal.App.3d 1122, 1135, discussing *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Here, the prosecutor argued that Zamorano admitted the crimes and that the only question for the jury was whether defendant aided and abetted Zamorano. During opening argument, the prosecutor argued, "I don't think the defense is going to argue those crimes were not committed. We know those crimes were committed. Jimmy Zamorano pled to them." The prosecutor further argued, "Again, the fact that the robbery

occurred is not an issue here. I don't anticipate defense getting up here and arguing to you that he wasn't robbed." It was not an issue that the crimes were committed by Zamorano and Son. The prosecutor also relied on the evidence to show that defendant was an active gang member. Defendant's counsel admitted in closing that the elements of robbery and attempted robbery were met in this case and the only issue was whether defendant aided and abetted the crimes. Defendant had no idea what Son and Zamorano were planning to do. Defendant did not have the intent to aid and abet; he was just a concerned dad.

The fact the jury was aware that Zamorano pleaded guilty to the same crimes for which defendant was on trial did not establish defendant's guilt. There was no question Zamorano committed the crimes and defendant was present at the scene. The issue for the jury was whether defendant aided and abetted Zamorano and Son. This was not proven by the fact the jury had knowledge Zamorano had pleaded guilty. The jury had to determine beyond a reasonable doubt that defendant aided and abetted Zamorano and Son.

Moreover, even without the admission of Zamorano's plea, other evidence established the necessary pattern of gang activity to prove the gang enhancement and that defendant was an active Hillside Riva gang member. As such, any error in admitting the evidence for this purpose was harmless as even had the trial court excluded Zamorano's plea, the result would be the same. Here, the People were required to prove a pattern of gang activity that included specific predicate crimes. In addition to Zamorano's plea, the prosecution admitted defendant's prior conviction in 2005 of willful discharge of a

24

firearm with a gang enhancement. This was relevant as both a predicate crime and to show that defendant was a Hillside Riva gang member. The jury could also rely on defendant's own commission of robbery in this case to establish the pattern of committing robberies. (*People v. Tran*, *supra*, 51 Cal.4th at p. 1046.) The prosecutor also presented evidence that there were prior crimes committed by other Hillside Riva gang members including Henry Vasquez, who committed felony assault in 2015, and Jose Flores who was convicted of attempted murder in 2010. Substantial evidence without Zamorano's pleas supported the true finding by the jury on the gang allegations without reliance on Zamorano's plea.

Moreover, as discussed *ante*, the evidence of defendant's guilt without the gang evidence, including Zamorano's plea, was overwhelming. Any conceivable error in admitting Zamorano's plea was harmless.

C.     654 STAY

Defendant contends the sentence on his criminal threat conviction for threats made to Bryan must be stayed pursuant to section 654.

1.     *ADDITIONAL FACTUAL HISTORY*

Defendant was prosecuted as an aider and abettor. The jury was instructed, "The defendant is charged in Count 1 with robbery and in Counts 2 and 3 with attempted robbery and in Count 4 with criminal threats. [¶] You must first decide whether the defendant is guilty of robbery or attempted robbery. If you find the defendant is guilty of either of those crimes or any of those crimes, you must then decide whether he is guilty of criminal threats. [¶] Under certain circumstances, a person who is guilty of one crime

25

may also be guilty of other crimes that were committed at the same time." The jury was further instructed that they must determine if making criminal threats was a natural and probable consequence of aiding and abetting the robbery. They were then instructed on the crime of criminal threats against Bryan.

The prosecutor argued in closing argument that defendant was also guilty of aiding and abetting the criminal threat to Bryan. The prosecutor contended, "That's [a] strong probable consequences, talking about the criminal threats. Robbery requires force and/or fear that's required to prove the robbery. [¶] Well, it's logical, then, that during the robbery somebody is likely to be threatened. That's the criminal threat." The prosecutor further argued that a robbery requires force or fear and a "threat is what gets this." The prosecutor identified the threats as ordering Bryan to get down on the ground or they would kill him, and also if he ran they would kill him.

At the time of sentencing, the trial court sentenced defendant on count 1, the robbery of Bryan, to the midterm of three years (doubled due to the strike). Counts 2 and 3, the attempted robberies, were ordered to run consecutive to count 1 based on multiple victims. As for count 4, the trial court ordered that "[t]he 422, the defendant is ordered to serve the low term of 16 months in state prison. That will be doubled because of the strike prior, and that will run concurrent to the time imposed in any and all other counts." The trial court did not provide any reasons for imposing the concurrent sentence.

2. *ANALYSIS*

Section 654, subdivision (a), provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

26

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Concurrent sentences on convictions subject to section 654 are prohibited. (*People v. Deloza* (1998) 18 Cal.4th 585, 592.)

"Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) "Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

Here, the trial court gave no indication as to its reasons for imposing concurrent sentences on the robbery and criminal threat convictions. The trial court had to impliedly determine that the course of conduct (1) did not involve a single physical act, and (2) reflected multiple intents and objectives. (*People v. Corpening*, *supra*, 2 Cal.5th at p. 311.) Whether a defendant harbored a separate intent and objective for each offense is a factual determination for the trial court, and its conclusion will be sustained on appeal if supported by any substantial evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 730.)

Defendant relies on *People v. Bradley* (2003) 111 Cal.App.4th 765 (*Bradley*) to support his claim that the criminal threats sentence should have been stayed. The defendant in *Bradley* was part of a scheme to lure a customer away from a casino for the

27

purpose of robbing him. (*Bradley,* at p. 767.) The defendant successfully located a victim and she drove him away from the casino in his car. She pulled over and two other males entered the vehicle. One of the males had a gun, which he pointed at the victim. (*Ibid.*) The victim was taken to a location and robbed. He was ordered into the trunk of his car but claimed to not know how to open the trunk. (*Id.* at pp. 767-768.) One of the men beat up the victim and shot him eight times. (*Id.* at p. 768.)

The victim survived and the defendant was convicted of attempted murder and robbery based on aider and abettor liability. Liability for the attempted murder was premised on the natural and probable consequences doctrine. (*Bradley*, *supra*, 111 Cal.App.4th at p. 768.) The trial court imposed consecutive sentences for the crimes. On appeal, the defendant raised a challenge under section 654. (*Ibid.*)

On appeal, the *Bradley* court held that it was error to impose consecutive sentences for the two crimes. (*Bradley*, *supra*, 111 Cal.App.4th at p. 772.) The court concluded that defendant "was neither tried nor convicted of the attempted murder charge on the theory she intended the commission of that crime. Rather she was convicted on a theory this second offense was a 'natural and probable' consequence of the offense she did intend, that is, the robbery." (*Id.* at p. 769.) The court noted the prosecutor could have elected to have the jury determine the defendant had the specific intent to attempt to murder the victim but did not do so. (*Id.* at p. 770.) Under such circumstances, "the trial court cannot countermand the jury and make the contrary finding [the] appellant in fact personally had both objectives. Indeed there is a complete absence of any evidence in

this record to support such a finding had the trial judge attempted to do so." (*Ibid*., fn. omitted.)

We agree with defendant that, here, there is no evidence defendant personally harbored multiple intents and objectives. The prosecutor argued to the jury that the threats were part of the robbery. "Well, it's logical, then, that during the robbery somebody is likely to be threatened. That's the criminal threat." There was no evidence that the criminal threats served another objective other than to facilitate the robbery of Bryan or that defendant possessed another intent other than to aid and abet the robbery.

The People rely on *People v. Nguyen* (1988) 204 Cal.App.3d 181, to support their claim that section 654 does not necessarily preclude multiple punishment where one crime was the natural and probable consequence of another. In *Nguyen*, the defendant and an accomplice armed themselves and entered a market. The defendant's cohort took the clerk to the back room and took money from his pockets. The defendant took money from the cash register. The victim heard the defendant shout "a Vietnamese battle phrase used when 'someone was to kill or be killed.' " (*Id*. at p. 185.) The defendant's cohort proceeded to kick the clerk in the ribs and shot him in the back. (*Ibid.*) The defendant was convicted of robbery and attempted murder and the trial court imposed consecutive sentences. On appeal, the defendant argued that section 654 applied because he was convicted of the attempted murder based on it being a natural and probable consequence of the robbery. (*Nguyen*, at pp. 189-190.) The Court of Appeal disagreed, explaining: "[A] separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found not incidental to robbery for

29

purposes of section 654. If the trier of fact determines the crimes have different intents and motives, multiple punishments are appropriate." (*Id*. at p. 193.)

The *Bradley* court distinguished *Nguyen* in that, "the aider and abettor of the robbery actively encouraged the shooter to kill the victim. . . . [¶] . . . [¶] As a result, applying the rationale of our opinion to *Nguyen* he would still be subject to consecutive sentencing. Ample evidence in the record of that case would support a finding Nguyen shared his cohort's independent objective of attacking the victim. Indeed he evidently was the instigator of that attack. This contrasts sharply with appellant's role—or actually nonrole—in her cohort's shooting of the victim here. Not only did she not encourage the attack, she was oblivious this deviation from the original plan was taking place until the shots rang out and the attempted murder was completed. [¶] Obviously, Nguyen personally entertained both objectives his principal had—to rob the store and to attack the victim. In the case before this court, it is equally obvious appellant only had a single objective—to rob the victim." (*Bradley*, *supra*, 111 Cal.App.4th at pp. 771-772, fns. omitted.)

The People claim that the threat here was gratuitous and made against a fleeing, unresisting victim, and that defendant shared the separate intents and objectives of Zamorano and Son to make criminal threats. However, the evidence does not establish that there were separate intents and objectives. As argued by the prosecutor, the threats were part of the robbery. There simply was no evidence presented that the threats to kill Bryan had a separate objective. As in *Bradley*, there is an absence of evidence in the record that defendant personally possessed dual objective and unlike *Nguyen,* where

30

defendant clearly intended to facilitate the attempted murder and robbery, no such evidence appears and is contradicted by the prosecutor's argument. The criminal threats conviction should have been stayed and we will so order.

## DISPOSITION

The sentence for the conviction of criminal threats is stayed pursuant to section 654. The trial court is directed to correct the abstract of judgment and forward a certified copy of the amended abstract to the appropriate authorities. (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 467.) We otherwise affirm the judgment in its entirety.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
 J.

We concur:

RAMIREZ
 P. J.

RAPHAEL
 J.